UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

SHERI A. POYNTER,

Plaintiff,

v.

ANDREW SAUL, Acting Commissioner of
Social Security,[1]

Defendant.

Case No. 2:17-cv-02525-JAD-EJY

**ORDER**

Re: Plaintiff's Brief in Support of Motion for
Reversal and/or Remand
(ECF No. 17)

Plaintiff Sheri A. Poynter ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying her application for disability insurance ("DIB") under Title II of the Social Security Act. For the reasons below, the Commissioner's decision is affirmed.

## I.     BACKGROUND

On December 16, 2013, Plaintiff filed an application for DIB alleging a July 1, 2013 onset of disability. Administrative Record ("AR") 187-90. The Commissioner denied Plaintiff's claims by initial determination on July 9, 2014, and on reconsideration on February 26, 2015. AR 123-27, 130-32. On March 6, 2015, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 133-34. After conducting a hearing on July 25, 2016 (AR 44-83), ALJ Gary Vanderhoof issued his determination on August 29, 2016, finding Plaintiff was not disabled (AR 17-43). On October 21, 2016, Plaintiff requested that the Appeals Council review the decision by the ALJ. AR 183-86. When the Appeals Council denied Plaintiff's request for review on July 28, 2017, the ALJ's decision became the final order of the Commissioner. AR 1-6. This civil action followed.

---

[1]      Andrew Saul is the current Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## II.     STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on correct legal standards and the legal findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In reviewing the Commissioner's alleged errors, the Court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986) (internal citations omitted).

"When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198, *citing Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  A reviewing court, however, "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted).  Finally, the court may not reverse an ALJ's decision on account of an error that is harmless. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) (internal citation omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## III.     DISCUSSION

### A.     Establishing Disability Under The Act

To establish whether a claimant is disabled under the Act, there must be substantial evidence that:

> (a)     the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and

2

(b)     the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999), *citing* 42 U.S.C. § 423(d)(2)(A).  "If a claimant meets both requirements, he or she is disabled."  *Id.*

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Tackett*, 180 F.3d at 1098 (internal citation omitted); 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five.  *Tackett*, 180 F.3d at 1098.

The five steps are:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(b).

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  *See* 20 C.F.R. § 404.1520(c).

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  *See* 20 C.F.R. § 404.1520(d).

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(e).

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits.  *See* 20 C.F.R. § 404.1520(f)(1).  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")],

or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits. *See id.*

*Id*. at 1098-99 (internal alterations omitted).

B.    **Summary of ALJ's Findings**

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since July 1, 2013, the alleged disability onset date. AR 26. At step two, the ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "restless leg syndrome, degenerative disc disease of the thoracic and lumbar spine, adhesive capsulitis of the right shoulder, depressive disorder, and anxiety disorder." *Id.* At step three, the ALJ found that Plaintiff's impairment or combination of impairments did not meet or equal any listed impairment in 20 C.F.R., Part 404, Subpart ("Subpt.") P, Appendix ("App.") 1. *Id.*

In preparation for step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[2] to:

> perform a range of light work as defined in 20 CFR 404.1567(b) except the claimant can stand and walk for four to five hours in an eight-hour workday and sit for six hours in an eight-hour workday, with normal breaks. The claimant cannot climb ladders, ropes, or scaffolds, but may perform all other postural positions occasionally. The claimant should be precluded from working at unprotected heights or dangerous moving machinery. The claimant can push and pull, and reach overhead, occasionally with her right upper extremity. Her left upper extremity is not limited. She may finger bilaterally unlimitedly. She is to avoid concentrated exposure to vibrations. The claimant is restricted to simple, non-detailed, non-complex work. The claimant may make decisions, attend and deal appropriately with workplace peers and supervisors with occasional teamwork changes. However, the claimant is best with working with one to three people in the immediate work site, and no large groups of people. The claimant may occasionally

---

[2]    "Residual functional capacity" is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1).

interact with coworkers and supervisors, although not in joint projects. She may not work with high production quotas for fast-paced activities. The work must only have a few variables, more a simple and routine nature.[3]

AR 28.

At step four, the ALJ determined that "[t]he claimant is unable to perform any past relevant work (20 CFR 404.1565)." AR 34. In preparation for step five, the ALJ noted that:

> [t]he claimant was born on January 26, 1963 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563). . . . The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564). . . . Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

AR 35.

At step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a))." *Id*. Relying on the vocational expert's testimony at the administrative hearing, the ALJ determined that Plaintiff could perform the following "light exertion level . . . [,] unskilled, with a SVP of 2" occupations: "[m]arker, DOT code 209.587-034;" "[o]rder [c]aller, DOT code 209.667-014;" and, "[m]ail [c]lerk, DOT code 209-687-026."[4] AR 36. The ALJ confirmed that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. *Id*.

The ALJ concluded that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2013, through the date of this decision (20 CFR 404.1520(g))." *Id*.

---

3    As defined under 20 C.F.R. § 404.1567(b): "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

4    DOT is an abbreviation for *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991).

**C.     Summary of Medical Evidence**[5]

**1.     Radiological Findings and Examinations**

On August 1, 2013, Plaintiff visited Dr. John B. Siegler, a physical medicine and rehabilitation doctor. AR 694-95. Dr. Siegler's interval review of systems was "[n]egative for any changes. [Plaintiff's] chart contains a self-reported review of systems completed by the examinee[.]" AR 694. A musculoskeletal examination revealed an "improved range of motion of [Plaintiff's] shoulder" in her upper extremities, and a spine examination showed "thoracic pain in the periscapular region. Gait is steady without the use of assistive devices." *Id*. A neurological examination rated Plaintiff's "[u]pper extremity hand grasps" as five out of five, and her sensation and tone as "intact." AR 695. Notwithstanding these clinical findings, Dr. Siegler assessed Plaintiff with "[s]tatus post rotator cuff repair," "[r]estless leg syndrome," and "[c]hronic thoracic pain." *Id*.

At three separate clinical visits, Plaintiff's treating physician and family medicine specialist, Dr. Yvonne Saunders, found generally normal results on examination, including "[n]ormal symmetry, tone, strength and [range of motion]. No effusions, instability or tenderness to palpation" was noted. AR 662 (November 8, 2013); AR 666 (August 12, 2013); *see also* AR 945 (July 23, 2014).

On March 21, 2014, Dr. Susan Hood-Jackson, a psychologist, performed Plaintiff's Psychosocial Evaluation. AR 811-17. Plaintiff appeared with "[d]epressed mood," "frequent crying," "low self-esteem," "high anxiety," "insomnia," and "excessive worry[ing] about finances." AR 811. Dr. Hood-Jackson noted Plaintiff had a nervous breakdown brought on by work stress two years ago and experienced a second nervous breakdown in June 2013. *Id*. Dr. Hood-Jackson stated Plaintiff was suffering from a "severe" case of restless leg syndrome, although she did not elaborate on how she came to this assessment. AR 813. Dr. Hood-Jackson also performed Plaintiff's mental status examination in which she described Plaintiff's self-care and appearance as "average height," "thin," "average weight," "neat/clean," "appropriate[ly dressed]," "well-groomed," "normal" posture/gait, although she was "restless," "agitated," and had "tremor[s]." AR 815. Dr. Hood-

---

[5]     Neither party contests the weight the ALJ accorded to the opinions provided by the state agency consultants (AR 85-100, 102-19) or by Dr. Bonnie Winkleman (AR 820-27). Accordingly, the Court declines to discuss these opinions.

Jackson described Plaintiff's motor activity as "restless," "agitated, and affected by "tremor[s]" (*id.*); facial expression as "anxious" and "sad" (*id.*); thought content as "hopeless," "worthless," and "somatic" (*id.*); thought processes as "tangential" (*id.*); affect as "sad" and "worrisome" (AR 816); mood as "depressed" and "anxious" (*id.*); and, her coping ability as "overwhelmed," "deficient[ly] support[ed]," and "deficient in coping skills" (*id.*). Dr. Hood-Jackson noted that Plaintiff had suicidal thoughts lasting longer than six months. *Id.* On the other hand, Dr. Hood-Jackson stated Plaintiff was "neat[ly]/clean[ly]" and "appropriate[ly]" dressed, "well-groomed," and had "normal" posture/gait. AR 815. Plaintiff was "cooperative," "alert," displayed "normal" eye contact, was not hallucinating, and was fully oriented. *Id.* Plaintiff's speech and attention/concentration were both "normal." *Id.* Plaintiff's insight was "present," judgment was "intact," and her memory was within normal limits. AR 816.

On July 24, 2014, Plaintiff visited the Las Vegas Spine & Pain Center complaining of "mid back pain." AR 922. Plaintiff described her pain as occurring in her "lower back with radiation to bilateral lower extremities, upper back pain[,] and right shoulder." *Id.* Plaintiff also complained of "intermittent neck pain" which was described as moderate to severe and "as burning, crampy, sharp, stabbing, throbbing, aching[,] and dull." *Id.* The onset of the pain was "gradual" and "occurring in a persistent pattern for 14 years," but also "gradually worsening." *Id.* At best, the pain intensity was described as a 2/10 and at worst 9/10. *Id.* The average was described as 7/10, with her current pain level at 6/10. *Id.* A review of systems was generally normal, although "[n]eck [p]ain," "[b]ack [p]ain," "[j]oint [p]ain," "[d]epression, [a]nxiety[,] and [p]anic [a]ttacks" were present. AR 922-23. A physical examination performed on Plaintiff's mental status, cranial nerves, and sensory systems all returned "[n]ormal" results. AR 923. Plaintiff's assessment of muscle strength and tone were rated five out of five in all areas except her right quadriceps, right hamstrings, anterior, and right gastroc-soleus, which were rated four out of five. *Id.* Plaintiff's general assessment of reflexes were all graded as "2+," which is normal. *Id.* A musculoskeletal examination of Plaintiff's cervical spine revealed "[c]ervical paravertebral muscle spasm" and "[p]ain with ce[r]vical flexion." AR 924. "Midline tenderness" was present "upon palpation of the thoracic spine, [t]horacic paravertebral

muscle spasm [was] noted, [as well as p]ain with thoracic extension/facet loading and [t]enderness over thoracic facets." *Id*. "Lumbar paravertebral muscle spasm [was] noted." *Id*. However, Plaintiff's straight leg raise ("SLR") test was negative for both legs. *Id*.

On August 21, 2014, Plaintiff visited Dr. Nianjun Tang, a physical medicine and rehabilitation specialist employed by Centennial Medical Group, for "reevaluation" and complaints "of pain of the middle back, lower back[,] and legs." AR 835. Plaintiff rated her pain level as eight out of ten and reported "persistent middle back pain, lower back pain[,] and leg pain." *Id*. Dr. Tang opined after an examination that Plaintiff's "[r]ange of motion of the thoracic and lumbar spine is restricted" and assessed Plaintiff with "[t]horacic disc degeneration," "[t]horacic disc displacement," "[l]umbrosacral spondylosis," and "[l]umbar facet syndrome." AR 836.

On July 29, 2014, Plaintiff consulted Dr. Mark Cirella, an anesthesiologist from Centennial Medical Group, about her restless leg syndrome. AR 838-44. Plaintiff stated that her "pain and nerve sensations have progressively worsened since" she first had symptoms about seven years before. AR 838. Plaintiff described her "pain at its worst during the past month as 9/10," at "its best during the last month as 2/10," and at the time of her clinical visit as "3/10." AR 839. Both of Plaintiff's thoracic and soft tissue examinations revealed "normal" gait and "upright and normal" stance. AR 841-42. Dr. Cirella's report does not make clear whether Plaintiff's soft tissue examination showed "tender" or "nontender" supraspinous and interspinous ligaments, but "tenderness" was "present" in Plaintiff's paraspinal muscle. *Id*. Plaintiff's range of motion was evenly distributed on both sides, except her extension was greater on her left side than on her right. AR 842. A neurological examination of Plaintiff's L4-L5 spinal segment and S1 vertebrae was normal. *Id*. A foot clonus test, Babinski test, SLR supine test, a FABRE test, Gaenslen's test, and Waddell's test all returned unremarkable results. *Id*. Dr. Cirella assessed Plaintiff with "[t]horacic disc displacement;" "[t]horacic radiculitis/radiculopathy;" "[r]estless legs syndrome;" and, "[l]umbar radiculitis/radiculopathy." AR 843.

On November 10, 2014, Dr. Tang documented "[t]horacic tenderness to palpation over the bilateral facet columns," and diagnosed Plaintiff with "[l]umbosacral spondylosis," "[r]estless legs syndrome," and "[t]horacic spondylosis." AR 912. On December 8, 2014, Dr. Tang again observed

"[t]horacic tenderness to palpation over the bilateral facet columns," and diagnosed Plaintiff with "[t]horacic spondylosis," "[l]umbosacral spondylosis," and "[c]ervical spondylosis." AR 909. On January 5, 2015, Dr. Tang made the same observations and assessments as she did on December 8, 2014. AR 906.

On February 16, 2016, a physician from the Las Vegas Spine & Pain Center noted that an MRI of Plaintiff's thoracic spine:

> showed mild accentuation of the thoracic spine curvature with convexity to the left in the upper thoracic spine and to the right in the lower thoracic spine. The vertebral bodies are normal in height. There is loss of normal hyperintense T2 signal in the thoracic intervertebral discs, consistent with disc desiccation. There are multilevel endplate changes and Schmorl's nodes particularly from T7-T8 to T11-T12. The thoracic spinal cord is grossly normal in signal. There are no significant posterior intervertebral disc abnormalities from T1-T2 to T9-T10. At T6-T7, there is [a] 1.5 mm left lateral disc protrusion. No significant posterior intervertebral disc abnormalities at T7-T8. At T10-T11, there is [a] central and right lateral annular bulge with facet joint hypertrophic changes. No significant neural foraminal narrowing. The AP diameter [in] the spinal canal is 15 mm. No significant posterior intervertebral disc abnormalities at T11-T12 and T12-L1. There is mild thoracic spondylosis in the mid and lower thoracic spine. Sagittal cervical spine images show spondylosis and disc disease at C5-C6.

AR 919. The physician also noted that an MRI of Plaintiff's lumbar spine:

> showed straightening of the lumbar spine, which could be secondary to spasm or positioning. Also, there is mild accentuation of the lumbar spinal curvature. The vertebral bodies are normal in height and morphology. There is diffuse patchy marrow signal. The conus medullaris is noted at L1 and is normal in signal. There is mild multilevel disc desiccation and spondylosis in the lower thoracic and in the lumbar spine. There are no significant posterior intervertebral disc abnormalities at L1-2 and L2-3. At L3-4, there is mild broad-based posterior annular bulge with ligamentum flavum and facet joint hypertrophic changes. No significant neural foraminal narrowing. The AP diameter of the spinal canal is 2 cm. At L4-L5, there is broad-based posterior annular bulge with ligamentum flavum and facet joint hypertrophic changes. No significant neural foraminal narrowing. The AP diameter of the spinal canal is 1.5 cm. At L5-S1, there is broad-based posterior annular bulge with ligamentum flavum and facet joint hypertrophic changes. No significant neural foraminal narrowing. The AP diameter of the spinal canal is 1.5 cm.

AR 919-20. A review of systems returned negative results for the most part, but "[b]ack [p]ain," "[j]oint [p]ain," "[m]uscle [p]ain," "[d]epression," and "[a]nxiety" were noted. AR 920. A physical examination was generally normal, including Plaintiff's cervical spine, which had "[n]ormal range of motion without pain." *Id*. However, "[m]idline tenderness upon palpation of the thoracic [and lumbar] spine[s]," "[t]horacic [and lumbar] paravertebral muscle spasm," "[p]ain with lumbar

extension/facet loading [on both the left and right sides]," and "[t]enderness with palpation over anterior [and posterior] aspect[s] of [Plaintiff's] shoulder" were noted.  AR 920-21.

On March 15, 2016, a physician from the Las Vegas Spine & Pain Center noted "[l]umbar paravertebral muscle spasm . . . , [p]ain with lumbar extension/facet loading [on both the left and right sides] . . . , [p]ositive [results on] straight leg raise [testing on both legs] . . . [, d]ecreased range of motion [in Plaintiff's shoulder, and t]enderness with palpation over [the] anterior [and posterior] aspect[s] of [Plaintiff's] shoulder."  AR 918.

On July 21, 2016, Plaintiff appeared before Dr. Saunders complaining of "restless leg syndrome," "anxiety," "minor right shoulder pain," and "mild restless legs."  AR 930.  Dr. Saunders opined normal clinical results, however, other than to add that Plaintiff's "right shoulder extension . . . elicit[s] minor tenderness."  AR 932.

### 2.    Treating Source Statement

On July 21, 2016, Dr. Saunders submitted a Treating Source Statement noting that she had been treating Plaintiff since June 5, 2007.  AR 926.  Dr. Saunders treated Plaintiff for her "[a]llergic [r]hinitis;" "edema;" "cramp of [l]imb;" "[h]yperlipiedemia;" "[d]epression;" "[i]nsomnia;" "[a]nxiety;" and, "[r]estless [l]eg [s]yndrome."  Id.  Dr. Saunders further opined that the symptoms and limitations related to Plaintiff's restless leg syndrome first appeared on June 5, 2007, and the symptoms and limitations related to her anxiety began appearing in May 2009.  Id.

Dr. Saunders checked boxes[6] indicating that Plaintiff:

- is likely to be "off task" at work more than 25% of the time (AR 926);

- is likely to be absent from work more than four days per month due to her impairment and/or treatment (id.);

- can "[r]arely" lift/carry less than ten pounds and can "[n]ever" lift/carry ten pounds or more (id.);

- requires the option to sit/stand at will (id.);

- does not require a cane or other assistive device to "ambulate effectively," but does need a cane or other assistive device "at least sometimes" (id.);

---

[6]    In this section "never" is defined as "not even once in an 8-hour work day;" "rarely" is defined as "1% to 5% of an 8-hour work day;" "occasionally" is defined as "6% to 33% of an 8-hour work day;" "frequently" is defined as "34% to 66% of an 8-hour work day;" and, "continuously" is defined as "67% to 100% of an 8-hour work day."  AR 927.

- can "[r]arely" reach overhead with her left arm/hand, "[o]ccasionally" reach in any other direction, handle, finger, and push/pull, and "[f]requently" feel (AR 928);

- can "[n]ever" reach overhead with her right arm/hand, "[r]arely" reach in any other direction and push/pull, "[o]ccasionally" handle and finger, and "[f]requently" feel (*id.*);

- can "[o]ccasionally" use her left or right foot (*id.*);

- can "[n]ever" climb ladders and scaffolds, "[r]arely" climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, and "[o]ccasionally" rotate her head and neck (AR 928–29); and,

- can "[n]ever" be near unprotected heights, vibrations, and moving mechanical parts, "[r]arely" be near extreme cold, and "[o]ccasionally" operate a vehicle, or be near humidity and wetness, dust/odors/fumes/pulmonary irritants, and extreme heat. (AR 929).

Dr. Saunders stated that Plaintiff's "[r]estless [l]eg [s]yndrome" supported her assessment of limitations. AR 927-29. Although Dr. Saunders was further prompted to explain "why the findings support the assessment," she did not do so. *Id.* Plaintiff reported being able to stand or walk for up to "30 minutes" in an 8-hour workday. AR 927. Dr. Saunders handwrote that Plaintiff "says . . . sometimes [she] use[s] a stick to get out of bed," and that she can ambulate "15 feet" without the device. AR 927-28.

D.    **Plaintiff's Symptom Testimony**

On examination by the ALJ at her July 25, 2016 administrative hearing, Plaintiff testified that the last time she worked was "at Sedgwick and [she] worked there for ten months . . . from October of 2012 . . . until June of 2013." AR 50. Thereafter, from an unspecified point in time through January 2014, Plaintiff began receiving unemployment benefits. AR 51. During this time, Plaintiff "was looking for work [other than a position as] a senior claims examiner because being a senior claims examiner requires an extremely large amount of work hours." AR 52. Plaintiff sought work as a "medical . . . adjuster," a clerk, and at a women's clothing store, to no avail. AR 52-53.

Plaintiff lives with her husband and two sons. AR 54. In the day time when she is home alone, Plaintiff "shower[s]," "cook[s]," "wash[es] dishes [although she has] to use [her] left hand to scrub dishes or wipe counters . . . because it hurts [her] right shoulder to do those things," "do[es] her] own laundry," "sweep[s] the floor" although she cannot "clean [her] entire house the way [she]

11

used to," "make[s her side of the] bed," "walk[s] for about 15 minutes" at a time, "do[es] some light yoga and stretching exercises," "watch[es] TV," occasionally "get[s] on the computer," and "take[s] care of [the family's finances]." AR 55-57, 64. Plaintiff explained that:

> a normal day for [her] is that [she] will get up. It will take [her] about an hour before [she] can do anything so [she will] get some breakfast or something to eat like yogurt or make [herself] some eggs or oatmeal or something[. She will then] eat, and . . . watch TV for about an hour, then . . . take a shower and . . . check the mail.
> Whatever chore [Plaintiff has] on [her] chore chart for that day, [she] will do. For instance, one of [her] chores is that [she has] to move everything from the counter and wipe the counters down, [and] clean the toaster out. And then [she] watch[es] a lot of Netflix . . . then [she will] get up and walk around the house, look in the boys' room.

AR 64-65. Plaintiff cannot clean her bathtub or shower without assistance, but has a driver's license and goes grocery shopping with her sons every two weeks when her husband visits. AR 56-58. Plaintiff sometimes leans "on the cart or will tell [her] boys [to] go get . . . things [on the grocery list] and then [she will] go outside and . . . sit down on a bench . . . for a few minutes, and then [she goes] back in the store[.]" AR 59. Plaintiff is able to place few items into a shopping cart. AR 60.

Plaintiff sees a pain management doctor every month. *Id.* Plaintiff testified that she and her husband were "trying to save . . . money for [her] to have a rhizotomy . . . for [her] upper back." *Id.* Plaintiff asked her doctors to cut back her medication. *Id.* For example, Plaintiff was "up [to] 16 milligrams of Klonopin [but now she is] now down to 1-1/2 milligrams a day." AR 62.

On examination by her attorney, Plaintiff testified that she "do[es] not a see a [mental health] counselor." AR 66. However, Plaintiff speaks to her psychiatrist:

> about [her] depression [and her] crying all the time, because [she has] tried so many different kinds of antidepressants and the side effects from the antidepressants affect [her] restless leg syndrome [by] mak[ing] it worse and so [she] can't take the antidepressants. And so, [Plaintiff and her psychiatrist] talk about things that [they] can do, that [she] can do that will make [her] feel better about [her]self. And those are the things like going for walks and trying to do something every day for either [her]self or [her] family. Right now [Plaintiff is] taking St. Johns' Wort. [Plaintiff had] been taking that for about maybe a month now which seems to be helping.

AR 67. Plaintiff cries "[p]retty regularly," about "two, three times a week." *Id.* Plaintiff's depression makes her not "feel like doing anything," and makes it "hard for [her] to get motivated."

12

AR 68. Although she does not know whether her side effects are caused by "medication" or "aging

or depression," Plaintiff is "unable to concentrate," which caused problems at her previous jobs. *Id*.

**E.      Vocational Expert ("VE") Testimony**

VE Lawrence K. Haney testified at Plaintiff's administrative hearing that Plaintiff had past

relevant work as a "claims examiner . . . DOT number 168.267-014, SVP 7, sedentary."[7] AR 71-72

(internal alteration omitted).  The ALJ then asked the VE to imagine a hypothetical individual:

> currently 53 [years] old.  She has a GED plus she . . . some college [education].
> She indicated [completed] secretarial [coursework] and, as she indicated, some
> minor other courses . . . .  [This individual can] lift and carry 20 [pounds]
> occasionally and 10 [pounds] frequently; occasional posturals, stoop, walk,
> balance, crouch, crawl; stand and walk four to five hours of an eight-hour day . . . ,
> and six with the normal breaks.  [This individual cannot use] ladders, ropes, or
> scaffolds, [or] work[] at unprotected heights or [with] dangerous moving
> machinery.
> [The hypothetical individual is able to make o]ccasional [use of] ramps and stairs;
> direct[ly reach] overhead with [her] right [hand] and push/pull [with her] right
> upper extremity . . . occasional[ly].  [The hypothetical individual can g]ross[ly]
> handl[e objects with her] right [hand] occasional[ly], [and with her] left [hand
> without limit.  She can use] both hands bilaterally [with no restrictions on] fine
> finger feeling . . . but she'd have to avoid concentrated exposure to vibrations as a
> condition of the worksite.  And as indicated 20/10, [the hypothetical individual can
> stand] four to five [hours in an eight-hour workday] and walk [or] sit six [hours out
> of an eight-hour workday].[8] . . .
> [The hypothetical individual is] restrict[ed] . . . to . . . simple non-detailed, non-
> complex work.  She can make decisions, attend and deal appropriately with
> workplace peers, bosses, with occasional teamwork changes, however [she works
> best] . . . if employ[ed] working with one, two, or three [people] in [the] immediate
> worksite, [and cannot work with] large groups of people.
> In addition, [this hypothetical individual can] only occasional[ly] interact[] with
> coworkers and supervisors, [and can]not [work] in joint projects. In addition, [she
> cannot do] work involving high production quotas or fast-paced activities.  And the
> work [she can perform] would be only with a few variables, more of a simple
> routine nature. . . .
> [S]he could not do her past work.  And obviously with simple, routine work there
> would be no transferability. . . . [W]ithin the confines of this . . . first hypothetical,
> would there be any kind of work you feel she could perform?

AR 72-73.  The ALJ clarified that Plaintiff would have no restrictions "fingering, handling, and

feeling," and could "occasional[ly] . . . stoop[ and] bend[]."  AR 74.  Opining that this hypothetical

indicates a "light-duty capacity . . . with . . . limited . . . exposure to people," the VE determined that

---

[7]      Although the transcript of the administrative hearing names the VE as "Larry Henne" (AR 46), the Court
believes this is an error.  The Commissioner identifies the VE as "Lawrence K. Haney" (ECF No. 20 at 2:24, 6:20, 6:23,
7:3, 7:6, 7:13-15), and the Court refers to him as such.

[8]      The transcript of the administrative hearing does not make clear what "20/10" means.

the hypothetical individual could perform the "SVP 2 light-duty[, unskilled] positions" of "marker," DOT number 209.587-034; "order caller," DOT number 209.667-014, and "mail clerk," DOT number 209-687-026. AR 75-76. The VE also listed the number of available positions for each occupation in the national economy. AR 76.

The ALJ offered a second hypothetical identical in all respects to the first hypothetical, except that the individual could only stand and walk for "a maximum [of] four hours . . . , and sit six" hours out of an eight-hour workday. AR 76. The VE responded that no jobs are available for this person because the positions he had discussed before are all "light-duty positions [requiring a worker to] either stand[] or walk[]." AR 76-77. The VE stated that the second hypothetical individual would be relegated to "sedentary" work. AR 77.

The ALJ then asked the VE: "[r]egardless of the first or second . . . hypothetical, if [an employee] fail[s] to show up for work . . . [he or she is] not going to be retained. So . . . how much [] work can [an employee miss] before [his or her employer will] subject [him or her] to termination? . . . [I]f [an employee] can't perform [work at a SVP level 1 or 2] . . . . how much missed work [would subject him or her to termination]?" *Id.* The VE responded that:

> [of t]wo studies done by the Department of Labor, one . . . published in 2010 indicat[ed that] the average employer will have or grant 11 days of sick leave per year. The second[ study,] called the Current Population Survey[, was] published in 2014[ and]indicat[es] that the average private sector employee misses about 8 percent[ or] 2.9 hours on a 35-hour work week.

AR 77.

The ALJ then asked the VE to build on his first hypothetical by assuming the individual: "appear[s] for work. . . . [H]ow much off task can [the individual] be throughout the workday before [his or her employer] find[s] that [he or she is] unemployable[?]" AR 77-78. The VE replied:

> [t]here's no particular study that [the VE] know[s] of that's ever been done on off task work behavior. It's always concentrated on kids in a class being off task in their studies. But [the VE] would extrapolate from the Current Population Survey of missed time that an average employee misses . . . about 8 percent [of an average work week]. So, [the VE believed] that if . . . [an employee] were off task anything more than 10 percent, [he or she is] not going to be employable for very long.

AR 79. The VE told the ALJ that "light [work can be defined as [the amount of weight] you pick up . . . or light [work can be defined [by] how much standing and walking you do . . . , so you have

14

a weight force and a positional category for strength." AR 80. The VE confirmed that if an employee "sit[s] half the time [at his or her work], [this job is] still going to be . . . a light-duty job." *Id*.

On examination by Plaintiff's counsel, the VE stated that it is "hard" to determine whether the light-duty positions he provided fall within the "category of light work that would allow for standing or walking four to five hours [out of an eight-hour workday]." AR 81. The VE explained that determining whether these occupations fall within this category of light work is:

> a judgment call because the DOT will just break . . . down [the occupations] by strength[. That is, the DOT occupational listings do not] give [the VE] the positional option. [The DOT lists occupations as] light duty, sedentary, heavy, et cetera, which . . . combine both [the strength and positional options] into [what the DOT] call[s] the strength category.
> And if it's light duty it'll say . . . you're primarily working but you're going to be lifting up to 20 pounds. But it could be a light-duty job because you're on your feet or it could be a light-duty job because you're lifting more than ten pounds.

*Id*. (internal alteration omitted). The VE confirmed that he only considered the limitations contained in the ALJ's hypothetical. *Id*. The VE noted that he pulled the number of available jobs in the national economy for each of the light-duty positions from the "Bureau of Labor Statistics, Department of Labor 2015." *Id*. The VE further stated that the job numbers he relied on "are part of an . . . Standard Occupational Code [or, "SOC"]. For example, [the SOC code will] just have cashier but there may be 18 different [types of] cashiers within the SOC code. . . . [T]he Department of Labor does not break down 12,000 separate occupations by number." AR 81-82 (internal alteration omitted). The VE confirmed that "the numbers for the SOC code . . . [are] reduced based on the limitations within the hypothetical." AR 82 (internal alteration omitted). The VE explained:

> [f]or example, the position of a marker, that's just somebody putting price tags on clothes . . . before [the clothes] get[] put out on a floor. [There are] 38 possible positions within that SOC code. So, what [the VE] did is [he] took the total number of jobs under that SOC code for marker, divided it by 38 , and that's how [he] came up with 54,012.

*Id*. The VE opined that "if a person were to be absent from work [without excuses] four times per month, this would "exceed all the statistics [he's] ever seen" respecting an ability to perform full-time work. *Id*. The VE confirmed that a "limitation to only simple non-detailed work . . . would obviously preclude any jobs requiring detailed written or oral instructions[.]" AR 82-83.

**F. Issue Presented**

Plaintiff contends the ALJ erred "in relying on vocational expert testimony to fulfill his step 5 burden without adequately addressing Plaintiff's post-hearing objections to that testimony, particularly [the ALJ's] failure to properly discuss outcome determinative rebuttal evidence[,]" and "by failing to analyze the opinion evidence in accordance with the regulations, Agency policy, and Ninth Circuit precedent." ECF No. 17 at 4:14-18.

**1. The ALJ properly denied Plaintiff's post-hearing objections.**

The Social Security Administration's Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-6-74 provides agency policy concerning testimony of a vocational expert.[9] Section B provides that the ALJ, after administering the oath or affirmation to the VE, "must (on the record) . . . [r]ule on any objection(s). The ALJs may address the objection(s) on the record during the hearing, in narrative form as a separate exhibit, or in the body of his or her decision."

Following the July 25, 2016 administrative hearing, Plaintiff's non-attorney representative filed a "Post-Hearing Memorandum of Law & Objections to the Vocational Witness' Testimony." AR 315-51. At issue presently is Objection V in which Plaintiff claimed that the "current labor market research and reliable sources of job information dictate that [the] positions [to which VE Haney referred] require more than occasional interaction with coworkers and supervisors." AR 319. Plaintiff's Memorandum contained a "Vocational Opinion Regarding the Limitation of Occasional Interaction with Coworkers and Supervisors" from Paula Santagati, a vocational rehabilitation counselor. AR 349-51. Santagati expressed her opinion that the "limitation of occasional interaction with coworkers and supervisors[, a limitation which the ALJ included in the hypotheticals posed to VE Haney,] precludes all work as the training and probationary period for any job would require more than occasional interaction with co-workers and supervisors." AR 349.

---

[9] The Court recognizes that the Ninth Circuit holds that "HALLEX is strictly an internal guidance tool [for the Social Security Administration], providing policy and procedural guidelines to ALJs and other staff members. As such, it does not prescribe substantive rules and … does not carry the force and effect of law." *Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000).

In his findings, the ALJ considered and denied each of the objections Plaintiff put forth in her Memorandum (AR 20-23) and, specific to Plaintiff's Objection V, the ALJ stated that:

> pursuant to HALLEX I-2-6-74, an Administrative Law Judge may use hypothetical questions to elicit the vocational expert's testimony about whether a person can perform work in the national economy, and may rely on such testimony if any conflicts with the DOT are resolved. Mr. Haney has extensive qualifications as a vocational expert. . . . As such, the undersigned accepts the above testimony based on Mr. Haney's expertise.

AR 23 (internal citation omitted). Plaintiff nevertheless argues it was error for the ALJ to rely on the ALJ's "lay opinion to resolve this conflict, without ever presenting [the] evidence [provided by Ms. Santagati] to the testifying vocational witness." ECF No. 17 at 8:3-4 (internal citation omitted). Plaintiff emphasizes that she is not "assert[ing] that the vocational expert at the hearing was not qualified on vocational issues in general" but, rather, that the ALJ impermissibly resolved the conflicting evidence from two VEs by relying on his lay opinion. *Id*. at 10:14-15 (internal alteration omitted). In other words, "the testimony of the vocational expert at the hearing did not resolve the alleged conflicts or inconsistencies presented by the subsequent vocational analysis because [VE Haney] was never presented with the inconsistencies in the first place." *Id*. at 10:1-4 (internal alterations omitted).

The Court finds the Plaintiff's argument unpersuasive. First, Plaintiff claims that she has an inviolable right "to present rebuttal evidence and confront evidence contrary to [her] claim." ECF No. 21 at 3:17-18 (internal citation omitted). The Commissioner does not contest this, and that is exactly what occurred here. Immediately after the hearing, Plaintiff was entitled to—and did— object to VE Haney's testimony. Thereafter, the ALJ considered and denied all these objections in his findings. Plaintiff, dissatisfied with the ALJ's findings, then raised her objections concerning VE Haney's testimony before this Court. Thus, no one has denied or is denying Plaintiff's opportunity to present rebuttal evidence and confront evidence against her.

Second, the Court agrees with the Commissioner, to the extent he states that:

> [Plaintiff] repeatedly asserts that the ALJ relied on his "lay" opinion at step five, but that is a mischaracterization. The ALJ relied on Mr. Haney's *expert* testimony to find that Plaintiff could perform jobs at step five. Ms. Santagati, unlike Mr. Haney, had no connection to this case. She drafted her statement about a year

> before the ALJ hearing – it was not prepared in response to Mr. Haney's testimony, but a document Plaintiff's counsel used in some other litigation . . . .

ECF No. 20 at 7:11-16 (internal citation omitted).  Put simply, Ms. Santagati's evidence is "neither significant nor probative," and the ALJ was therefore not required to discuss this evidence.  *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Indeed, VE Haney is the only vocational expert who heard the social limitation in question at the administrative hearing and subjected himself to examination by Plaintiff's counsel.  "[P]er his expertise, [VE Haney then] identified three unskilled jobs someone with that limitation could perform.  . . . [Further,] Mr. Haney's testimony was grounded in the DOT and was, therefore, reliable notwithstanding Plaintiff's objection[.]"  ECF No. 20 at 7:4, 6–7 (internal citation omitted).  As a matter of fact, one of the very cases Plaintiff cites to in her Brief (ECF No. 17 at 5:16–17 (internal citation omitted)) provides that:

> the ALJ's reliance on the VE's testimony regarding the number of relevant jobs in the national economy was warranted.[]  An ALJ may take administrative notice of any reliable job information, *including information provided by a VE*. . . . A VE's recognized expertise provides the necessary foundation for his or her testimony.  Thus, no additional foundation is required.

*Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (emphasis added and footnote omitted).  Here, the ALJ properly relied on VE Haney's expert testimony in order to meet his step five burden under the sequential evaluation process.

Third, Plaintiff takes issue with the fact that VE Haney did not have an opportunity to reconcile his testimony with the subsequent vocational analysis provided by Ms. Santagati but, as Defendant points out, this makes no sense.  Plaintiff apparently suggests that "an ALJ's step five finding . . . cannot stand if another attorney submits anything from another VE, no matter how illogical or unconnected to the case it is[] after the fact and the ALJ does not get the first VE to refute it."  ECF No. 17 at 8-11.  Indeed, taking Plaintiff's argument at face value, an ALJ would be required to ensure that a vocational expert, who testified at an administrative hearing, would testify a second time after the close of the initial hearing whenever a claimant retained vocational expert submitted a contrary post-hearing evidence.  This makes no sense.  Moreover, despite Plaintiff's contention that VE Haney failed to discuss the evidence Ms. Santagati provided, a review of Ms. Santagati's statement reveals that she is the one who did not specifically address the three jobs VE Haney opined Plaintiff could perform.

Accordingly, the ALJ properly considered and denied Plaintiff's post-hearing objections to VE Haney's testimony.

### 2. The ALJ properly gave "little weight" to Plaintiff's treating physician's opinion.

In accordance with Social Security regulations, courts have "developed standards that guide our analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (internal citation omitted). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). For claims filed before March 27, 2017, as is the case here, "the opinion of a treating physician is [given] greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a nonexamining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal citation omitted).

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."[10] *Garrison*, 759 F.3d at 1012 (internal citation omitted). "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*, *citing Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). To satisfy the "substantial evidence" requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof,

---

[10] Plaintiff maintains that "[t]he ALJ failed to provide clear and convincing reasons for rejecting the treating source opinions." ECF No. 17 at 14:10-11. In contrast, Defendant contends that "an ALJ must give *good reasons* that are supported by substantial evidence" in order to reject a contradicted treating physician's opinion. ECF No. 20 at 9:17-18 (emphasis added). In any event, the Ninth Circuit has employed the specific and legitimate reasons standard to review an ALJ's decision rejecting a treating physician's contradictory opinion. *Garrison*, 759 F.3d at 1012 (internal citation omitted). This Court is bound to follow Ninth Circuit precedent. Plaintiff also seems to suggest that the ALJ's failure to award Dr. Saunders' opinion more weight solely on account of their treatment relationship amounts to reversible error. ECF No. 17 at 14:27-15:19. Plaintiff's assertion is unpersuasive. "[T]reatment relationship" is just one of many factors the ALJ is tasked with reviewing in deciding how much weight to accord to a contradicted treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating sources . . . . When we do not give the treating source's medical opinion controlling weight, [as here,] we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion.").

and mak[e] findings." *Garrison*, 759 F.3d at 1012, *citing Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id*. (internal citation and quotation marks omitted). The ALJ can never arbitrarily substitute his own opinion for the opinion of competent medical professionals. *Tackett*, 180 F.3d at 1102-03.

Here, the ALJ gave little weight to the opinion of Plaintiff's treating physician, Dr. Saunders because (a) Dr. Saunders failed to substantiate her opinion; (b) Dr. Saunders' "opined limitations are not consistent with the longitudinal record, which largely shows intact strength, reflexes, and range of motion, with normal gait and sensation"; (c) Dr. Saunders "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant;" and, (d) Dr. Saunders' own reports do not support her clinical findings. AR 33.

a.    The Court declines to consider (i) whether Dr. Saunders substantiated her opinion and (ii) whether Dr. Saunders' opinion is inconsistent with the longitudinal record because Plaintiff failed to adequately brief these issues.

A medical opinion may be rejected by the ALJ if it is conclusory or inadequately supported. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). That is because the Social Security regulations "give more weight to opinions that are explained than to those that are not." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001). An ALJ may permissibly reject opinions if they do not contain any explanation of the bases for their conclusions and are not supported by treating notes. *Trevizo v. Berryhill*, 871 F.3d 664, 667 n.4 (9th Cir. 2017); *Garrison*, 759 F.3d at 1014 n.17; *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996).

i.    *Plaintiff failed to challenge the ALJ's finding that Dr. Saunders' opinion was unsubstantiated.*

Here, Plaintiff failed to challenge the ALJ's characterization of Dr. Saunders' opinion as unsubstantiated and, therefore, her argument on this basis is waived. *Wilcox v. Commissioner*, 848 F.2d 1007, 1008 n.2 (9th Cir. 1998) ("[a]rguments not addressed in a brief are deemed abandoned"). Because Plaintiff failed to provide adequate briefing, the Court declines to consider this issue. But, even if the contrary were true, any error resulting from the ALJ's failure would be harmless as the

ALJ provided two legally sufficient reasons to discount Plaintiff's treating physician's opinion; that is, Dr. Saunders' opinion appears to rely heavily on Plaintiff's subjective complaints and is unsupported by her own treatment records. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (an error is harmless when "it is clear from the record that the . . . error was inconsequential to the ultimate nondisability determination").

> ii. *Plaintiff failed to challenge the ALJ's finding that Dr. Saunders' opinion was inconsistent with the longitudinal record.*

Relevant factors when evaluating any medical opinion include the amount of relevant evidence that supports the opinion, the quality of the explanation provided in the opinion, and the consistency of the medical opinion with the record. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007); *Orn*, 495 F.3d at 631. Here, the ALJ found "Dr. Saunders['] opined limitations are not consistent with the longitudinal record, which largely shows intact strength, reflexes, and range of motion, with normal gait and sensation." AR 33, *citing* AR 662, 666, 694, 811-19, 820-27, 835-45, 906-13, 918-25, 932, 945.[11]

Plaintiff claims the ALJ erred because he failed to consider that Dr. Saunders, a treating source, examined Plaintiff and consulted the medical evidence in its entirety unlike the other physicians in the record. ECF No. 17 at 18:9-11. While it is true that the extent to which a medical source is "familiar with the other information in [the claimant's case record]" is relevant when assessing the weight of that source's medical opinion, this factor is far from dispositive. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). Rather, a treating source's familiarity with a claimant's case record is just one factor that the ALJ is required to consider when determining the weight to give a treating source's medical opinion. Indeed, the very sentence that comes before the discussion of a claimant's case record in the Regulations states that the Commissioner "will also consider any factors . . . which tend to support or contradict the medical opinion." *Id.*

---

[11]     In its Cross Motion and Response, Defendant cites to other evidence in the record contradicting Dr. Saunders' opinion. ECF No. 20 at 13:20-14:10, *citing* AR 29-34, 95-97, 112-17, 542, 693, 864-65, 868, 871, 874, 876-77, 880, 882-83, 889, 892, 895, 897, 940. However, the ALJ did not reference these pages in finding inconsistency between the longitudinal record and Dr. Saunders' Treating Source Statement. Therefore, the Court does not discuss this evidence because it can only affirm the ALJ's decision on a ground upon which he relied. *Stout*, 454 F.3d at 1054. Moreover, because neither party contests the weight the ALJ afforded Dr. Winkleman's opinion (AR 820-27), the Court does not discuss this evidence. *Supra* note 5.

In any event, Plaintiff does not challenge the ALJ's finding of inconsistency between Dr. Saunders' Treating Source Statement and the longitudinal record and, therefore, waived any argument she may have had on this basis. *Wilcox*, 848 F.2d at 1008 n.2. Plaintiff only challenges the ALJ's alleged failure to consider Dr. Saunders' familiarity with the information available in Plaintiff's case record and, does not discuss the ALJ's findings with respect to the inconsistent clinical findings concerning her "strength, reflexes, and range of motion[.]"[12] AR 33 (internal citations omitted); *see also* ECF No. 17 at 18:9-16. As it is not the Court's role to distill potential arguments that could be made based on the record, the Court finds Plaintiff waived any argument on this basis. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones."). Therefore, the Court upholds the ALJ's assignment of little weight to Dr. Saunders' opinion for the reasons below.

b. Dr. Saunders' opinion appears to rely heavily on Plaintiff's subjective complaints.

A physician's opinion may be rejected if it is based on a claimant's subjective complaints which were properly discounted. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion. *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014); *Ryan*, 528 F.3d at 1199-1200. Here, the ALJ concluded that Dr. Saunders "apparently relied quite heavily on the subjective report of symptoms

---

[12] This Court determined that the ALJ was required to provide specific and legitimate reasons to reject Dr. Saunders' opinion because it was inconsistent with other opinions in the record. *Supra* note 10; *see also Garrison*, 759 F.3d at 1012. Although Plaintiff argues that the ALJ erred when he found Dr. Saunders' opinion inconsistent with the longitudinal record, she never explains on what basis the ALJ purportedly erred. ECF No. 17 at 18:3-4. When a claim of error is not argued and explained, as here, the argument is waived. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) (holding that a party's argument was waived because the party made only a "bold assertion" of error, with "little if any analysis to assist the court in evaluating its legal challenge").

and limitations provided by the claimant (e.g., she notes that the walking and standing limitation was per the claimant), and seemed to uncritically accept as true most, if not all, of what the claimant reported regarding her pain and limitations." AR 33.

Plaintiff asserts that "[o]f course" Dr. Saunders relied on Plaintiff's subjective complaints in her medical source opinion because "[c]onsideration of subjective complaints is always part of the picture and is always (very appropriately) considered by a medical provider . . . . However, there is no basis in this record to assume that Dr. Saunders was not able to sort through the subjective and objective evidence before arriving at her conclusions[.]" ECF No. 17 at 15:26-16:3 (internal alteration and footnote omitted). Plaintiff's argument paints half a picture.

First, there is no basis in this record upon which the Court may rely to assume, let alone conclude, that Dr. Saunders was able to sort through the subjective and objective evidence or that she did, in fact, sort through such evidence before arriving at her conclusions. Second, as previously discussed, Dr. Saunders did not cite to any clinical findings in her Treating Source Statement. *See, e.g.*, AR 926-29. What the Treating Source Statement does reveal is that Dr. Saunders relied on Plaintiff's subjective symptoms complaints in formulating at least two of her responses. When confronted with a medical opinion that only cited Plaintiff's self-reports twice and to nothing else, the ALJ appropriately found that the Treating Source Statement was premised primarily—if not entirely—on Plaintiff's subjective complaints. AR 33. Where the ALJ's interpretation of the record is reasonable, as it is here, it should not be second-guessed. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Accordingly, the Court finds the ALJ did not err in discounting Dr. Saunders' opinion because it appears to have relied extensively on Plaintiff's subjective complaints.

c.     Dr. Saunders' opinion is unsupported by her own treatment notes.

A medical opinion may be rejected if it is unsupported by medical findings. *Bray*, 554 F.3d at 1228; *Thomas*, 278 F.3d at 957; *Tonapetyan*, 242 F.3d at 1149 (9th Cir. 2001). An ALJ may also discredit physicians' opinions that are unsupported by the record as a whole. *Batson*, 359 F.3d at 1195. Moreover, an ALJ is not obliged to credit medical opinions that are unsupported by the medical source's own data and/or contradicted by the opinions of other examining medical sources. *Tommasetti*, 533 F.3d 1035 at 1041.

23

Here, the ALJ found that Dr. Saunders' "report failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact limited to the degree opined by [the] doctor[,] and Dr. Saunders did not address this weakness. Specifically, Dr. Saunders['] own report shows normal symmetry, tone, strength, and range of motion in the claimant's musculoskeletal system." AR 33. The ALJ refers to the treatment notes Dr. Saunders completed on the same day she submitted her Treating Source Statement. That is, on July 21, 2016, Dr. Saunders' examination findings revealed, *inter alia*, no associated signs and symptoms of present illness (AR 930); "negative" results on every review of Plaintiff's symptoms (*id*.); and, "normal" results except "right shoulder extension . . . elicit[ing] minor tenderness" (AR 932). These routine findings are clearly inconsistent with Dr. Saunders' Treating Source Statement, which found essentially debilitating limitations. In addition, as stated by the ALJ, "many [of Dr. Saunders' other] reports fail to note any edema[, effusion, deformity, clubbing, cyanosis, instability, or tenderness to palpation]." AR 33, *citing* AR 662, 666, 932, 945.[13] A review of the record shows this to be true. Although Dr. Saunders diagnosed Plaintiff with "[r]estless leg syndrome" in two of these reports (AR 932, 945), these assessments are internally contradicted by otherwise normal clinical findings and negative examination results across the board.

Plaintiff maintains that Dr. Saunders' treatment notes are not inconsistent with her Treating Source Statement, but her arguments are unpersuasive at best. Plaintiff first alleges that Dr. Saunders previously "described [her] symptoms of restless leg syndrome to be 'severe' in October 2011. . . . In [December 2011, Dr. Saunders] described Plaintiff's condition as 'the worst case for restless leg syndrome I have ever seen.'" ECF No. 17 at 16:18-21, *citing* AR 383, 415. Plaintiff also points out that Dr. Saunders "noted [she] had been compliant with every treatment and referral and advised Plaintiff to try medical marijuana" at the December visit. *Id*. at 17:6-7, *citing* AR 415.

---

[13] The ALJ also cites to pages 953 and 957 of the record, but the Court does not do so because they are identical to two earlier referenced pages. In its Cross-Motion and Response, Defendant also cites to these two pages (AR 953, 957), as well as to pages of opinions from other medical providers (AR 694, 815, 820, 841-42, 920) allegedly evidencing inconsistencies with Dr. Saunders' Treating Source Statement. ECF No. 20 at 13:7-8. However, the ALJ never cited to the latter set of pages in this portion of his analysis, perhaps because these citations belong in the analysis of inconsistency between Dr. Saunders' Treating Source Statement and the longitudinal record instead. The Court does not discuss these citations because it is constrained to affirm or deny the ALJ's finding on a ground that he invoked in making his decision. *Orn*, 495 F.3d at 630; *Stout*, 454 F.3d at 1054.

Notwithstanding Plaintiff's contentions, these citations actually support the ALJ's finding of inconsistency between Dr. Saunders' treatment notes and her Treating Source Statement. Dr. Saunders' review of symptoms at both of these visits generally returned negative results. The sole exception comes from a review of Plaintiff's neurological systems at the December visit, where Dr. Saunders quotes Plaintiff's self-report: "yesterday 'I had horrible (leg) pain.'" AR 413. However, a mere two pages later, Dr. Saunders made the following contrary clinical findings concerning Plaintiff's neurological system: "CN 2-12 normal. Sensation to pain, touch, and proprioception normal. DTRs normal in upper and lower extremities. No pathologic reflexes." AR 415. In addition, at both of the October and December visits, Dr. Saunders found Plaintiff exhibited "[n]ormal gait and station. No misalignment, asymmetry, crepitation, defects, tenderness, masses, effusions, decreased range of motion, instability, atrophy or abnormal strength or tone in the head, neck, spine, ribs, pelvis or extremities." AR 382, 415.

Plaintiff nonetheless argues that Dr. Saunders' notes support her Treating Source Statement because Dr. Saunders "had to remove [Plaintiff] from antidepressants to try to control her severe symptoms" (*id*. at 16:22-23, *citing* AR 393) and "took Plaintiff off work" (*id*. at 16:24, *citing* AR 450).[14] However, a review of symptoms at the clinical visit where Dr. Saunders took Plaintiff off antidepressants returned negative results. AR 391. In addition, it is true that Dr. Saunders wrote a one-sentence physician's note asking Plaintiff's employer to exempt her from work *for two days* "due to illness," but temporary limitations are not enough to meet the durational requirement for a finding of disability. AR 450; *see also* 20 C.F.R. § 416.905(a) (requiring a claimant's impairment to be expected to last for a continuous period of not less than twelve months); *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (affirming the ALJ's finding that treating physicians' short-term excuse from work was not indicative of the "claimant's long-term functioning").

---

[14]     Plaintiff also cites to treatment records provided by Dr. Richard S. Lee (ECF No. 17 at 16:23-17:4, 17:7-9) (internal citations omitted)) as support, but these records are irrelevant to determining whether *Dr. Saunders*' treatment notes support her Treating Source Statement. Accordingly, the Court does not discuss these findings in this section.

In sum, "the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is . . . inadequately supported by clinical findings." *Bray*, 554 at 1228. Accordingly, the Court finds the ALJ did not err in finding Dr. Saunders' treatment notes failed to support her Treating Source Statement.

## IV. CONCLUSION

The ALJ properly overruled Plaintiff's post-hearing objections to VE Haney's expert testimony. Plaintiff failed to provide adequate briefing on whether the ALJ properly assigned little weight to Dr. Saunders' opinion based on its lack of support and inconsistency with the longitudinal record and, therefore, the Court declines to consider these issues. In any event, the ALJ appropriately found, using the specific and legitimate standard, that Plaintiff's treating physician's contradicted opinion should be afforded little weight because the opinion appears to rely heavily on Plaintiff's subjective complaints and is unsupported by Dr. Saunders' own treatment records.

Accordingly,

IT IS HEREBY ORDERED that Plaintiff's Brief in Support of Motion for Reversal and/or Remand (ECF No. 17) is DENIED, and Defendant's Cross Motion to Affirm the Commissioner's Decision and Response to Plaintiff's Motion for Reversal (ECF No. 20) is GRANTED.

DATED THIS 19th day of March, 2020.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE